755 So.2d 927 (1999)
Elizabeth S. WOODWARD
v.
Melvin M. GEHRIG, Jr. and Natalie D. Gehrig.
Nos. W99-242, W99-435.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1999.
Writ Denied February 2, 2000.
*928 Karl E. Boellert, Kenneth Michael Wright, Lake Charles, for Elizabeth S. Woodward et vir.
Hunter William Lundy, Milo Addison Nickel, Jr., Michele S. Caballero, Lake Charles, for Melvin M. Gehrig, Jr., et ux. in No. W99-242.
Christopher Paul Ieyoub, Milo Addison Nickel, Jr., Michele S. Caballero, Lake Charles, for Melvin M. Gehrig, Jr., et ux. in No. W99-435.
Before: THIBODEAUX, COOKS and WOODARD, Judges.
COOKS, J.
This case involves a continued dispute between neighbors over the use of a servitude. In Woodward v. Gehrig, 97-1040 (La.App. 3 Cir. 2/11/98); 707 So.2d 1322, writ denied, 98-651 (La.4/24/98); 717 So.2d 1177, a panel of our members detailed chronologically the events and ongoing litigation predating the present feud. We recite from that case in relevant part:
Elizabeth Woodward is the developer of Cyprien Estates, a subdivision on Prien Lake Road in Lake Charles, Louisiana. Prior to June 1992, she owned Lots One through Six within the subdivision. Ms. Woodward's home is situated on Lot Five. Cyprien Lane is the primary road which runs through the subdivision and provides access to all lots except Lot Five. To access Cyprien Lane from her home, Ms. Woodward constructed a private passage leading from Lot Five to Cyprien Lane and running through Lot Four.

*929 On June 5, 1992, Mr. and Mrs. Gehrig purchased Lot Three and the West half of Lot Two to build a home on the property. On the same date, an act of servitude of way of passage was properly executed establishing a conventional servitude on the North thirty feet of Lots One, Two, Three, and Four. Ms. Woodward and her husband created this passage along through the rear portion of these lots in order to access Lock Lane from Lot Five.
After their March 11, 1994 acquisition of Lot One and the East half of Lot Two, the Gehrigs owned Lots One, Two, and Three. The entrance to the servitude is located on Lot One. At the entrance of the servitude is a gate which the Gehrigs kept locked. The Gehrigs also constructed a garage and tool shed which are partially situated on the servitude.
This dispute arose after the Gehrigs refused Ms. Woodward's request that they either unlock the gate or give her the keys to access the gated entrance. On July 22, 1996, Ms. Woodward filed a preliminary and permanent injunction seeking recognition of the servitude and access to the servitude free of interference by the Gehrigs. Specifically, she alleged that the Gehrigs maintained a locked gate at the entrance of the passage which inhibited her access to the passage and that the Gehrigs constructed a garage and other improvements on the servitude without her consent.
The trial court denied Ms. Woodward's request for injunctive relief. On August 14, 1996, the Gehrigs filed an answer and reconventional demand alleging that Ms. Woodward had violated the building restrictions of the subdivision and had inflicted emotional distress upon them. Thereafter, the plaintiff filed a motion for summary judgment, which was subsequently rejected by the trial court.
After reviewing the evidence at trial, the trial court rendered a final judgment which recognized a valid and existing conventional servitude in accordance with the June 5, 1992 act of servitude of passage. The trial court also enjoined the Gehrigs from interfering with the servitude until they could provide another equally adequate and convenient location or route for the servitude. Mr. and Mrs. Gehrig were ordered by the trial court to remove all obstructions on the servitude within sixty days of rendition of the judgment and to remove the lock from the gated entrance of the servitude.[1]
We affirmed the trial court's judgment in all respects, except that portion ordering defendants to provide an alternative route for the servitude. In so ruling, we noted, La.Civ.Code art. 748, grants the owner of the servient estate the option of relocating the servitude only if one of two conditions exist: "(1) the original location of the servitude has become more burdensome for the owner of the servient estate, or (2) the original location of the servitude prevents the owner of the servient estate from making useful improvements on his estate." Finding the record did not contain any evidence establishing that either prerequisite existed, we reversed the order directing defendants to construct an alternative route. The Gehrigs then filed for writ of certiorari with the Louisiana Supreme Court, which was denied on April 24, 1998.
On May 4, 1998 the Woodwards filed and specifically alleged in their pleading entitled Rule To Show Cause and Motion for Expedited Hearing that "[d]espite amicable demand for compliance with [the] terms of the judgment, [the Gehrigs] ... failed and refused to unlock and/or open the gates barring the entry to, and use of, the servitude." They sought an order directing the Gehrigs to show cause at an expedited hearing why a writ of distringas *930 should not be issued and the sheriff or some other person appointed by the court to remove the gates and all other obstructions; and why the Gehrigs should not be adjudged in contempt of court, ordered to pay damages, attorney's fees and expenses incurred by them in bringing the rule.
On the same date this pleading was filed, the Gehrigs' newly retained co-counsel (Mr. Christopher Ieyoub) faxed a letter to the Woodwards' attorney expressing:
As I told you on the telephone today, I am hopeful that my involvement on behalf of Mel and Natalie Gehrig may help to bring about an amicable resolution of this case. I was told that the gates, while unlocked, were left closed to limit access to unwelcome intruders, not only to the Gehrig property but to the property of your clients as well.

If your clients are unhappy with the gates being closed, let me suggest that the Gehrigs will agree to open the gates and to leave them open. There has been some speculation that Mr. Woodward would like to remove or demolish some structures or trees which, while not on the roadway, may be within the servitude. This would seem inequitable.
May I suggest by way of compromise that the gates will remain unlocked and open and the roadway unobstructed, and that the Gehrigs be permitted to leave whatever structures or trees are currently in the servitude but not the roadway, in place.
I am removed from whatever personalities may be involved in this litigation and it seems to me this is a rational solution. Please run this by your clients and give me your thoughts.
The Woodwards' attorney wrote a letter on May 8, 1998 to Mr. Milo Nickel, lead counsel for the Gehrigs. A copy of that letter was forwarded to Mr. Ieyoub and it reads in pertinent part:

[Y]ou will note that the lattice wood fence, erected after the judgment was rendered, encroaches on the right-of-way for a considerable length. The survey does not show, however, any trees or other vegetation placed on the passage by your client.
We would ask that your client remove all the items place there by him, including the fence, so that the crosstie barrier can be moved and situated along the Southern boundary. Also, please let me know whether your client wants to keep possession of the gate which will have to be removed to allow passage of trucks and emergency equipment.

The Rule filed by the Woodwards was fixed for hearing on May 13, 1998; but the matter was continued by Judge Brunson because the Judgment had not become final. The Judge did conduct a pretrial conference, however; and, according to Milo, the Judge indicated he believed the Judgment only required that the Gehrigs leave the gate unlocked and not opened. Again according to Milo, Judge Brunson's comments were "based in part on the fact that the gates were not erected or placed on the property by the Gehrigs, but were originally placed on the property by the Woodwards." Milo also relates that the parties agreed during the pretrial conference to stipulate in open court that "they would maintain the status quo" pending hearing on the rule. Neither the alleged stipulation nor minutes of the pretrial conversations between the attorneys and the Judge appears in the record.
Shortly after the conference, the Woodwards hired a contractor who removed the gates from the site. According to the Woodwards' attorney "when it became obvious... that [the Gehrigs] would not open the gate at the entrance to the servitude and keep it open as declared before Judge Brunson, it was removed in its entirety." Offended by the Woodwards' action, the Gehrigs filed a complaint with the District Attorney's office seeking to have Mr. Woodward and the contractor charged with theft and unauthorized use of a movable. On cross examination at the June 29, 1998 Show Cause hearing, Mr. Gehrig admitted *931 (after rendition of the trial court's judgment in May 1997) the only obstructions he removed from the servitude area were a storage shed and a "lean-to." He then constructed a wrought-iron fence with concrete posts and a lattice fence to enclose his back yard which extended in the servitude area. He also testified "[w]e planted trees and shrubs and we replaced bushes and we filled in large ditches that were along our back yard." When asked to explain why he failed to remove existing obstructions and continued to place new ones in the servitude area, Gehrig stated:
Q. And then there are a number of smaller trees which appear to have been planted; is that correct?
A. Yes, it is.
Q. Between the-and these are trees that you caused to be planted on this property?
A. As I said before, that area where the small trees are was nothing but garbage. It was ditches, open ditches, water retaining, nasty bushes, bramble bushes, poison ivy. We had that all ripped out and we replaced it with decent material.
Q. Well, my question to you, Mr. Gehrig, is that you caused these small trees to be planted along here; is that correct?
A. Yes.
Q. And then on the other side of the wood storage shed, you also caused a number of other small trees to be planted in a row along the property line?
A. We didn't cause them. We replaced garbage with decent things.
Q. Well, it's a question of semantics, Doctor, you actually had these trees planted or planted them yourself?
A. Fine.
* * *
Q. Now, let me ask you this, Mr. Gehrig, is it my understanding of your testimony to the Court today that this wooden lattice fence, which starts on Lot 2 and goes over to a good portion of Lot 3 and is within the 30-foot right-a-way, you do not intend to remove that; is that correct?
A. I'm waiting to see what the Judge says about that.
Q. Let me ask you this; do you intend to remove the concrete foundation for the wood storage shed?
A. I would like to hear what the judge says about that, also.
Q. So your attitude before this Court today is irrespective of the language of the judgment rendered by Judge Painter and approved by the Court of Appeals, and writs denied by the Louisiana Supreme Court, you want us to come before this judge today to decide what else you're going to do on this right-of-way; is that correct?
A. I'm waiting to see what-if the property that we bought and purchased is our property or if it is not our property. All the trees we purchased, the large trees that were there, the retaining wall-I would love to know if this is really my property or not. If it's not my property, then I would like to be reimbursed for the property that I thought I bought five or six years ago. And the improvements that we've also done out there, if they're not my property, I would love to know that, `cause if it's not, I think we've been cheated tremendously.
Q. Did you discuss that with your counsel prior to this case going to trial?
A. I've said that for two years and I've told Bill Woodward that, I've told everybody that. We are totally being cheated. We are beingthe court system, the way it was written, the things that were done to use, the vindictive things that were done to us in the last couple of years, the abuse that we've taken from these peopleI would love to know what rights I have in this whole situation, `cause I really, to this day, I don't know that my rights are.

*932 Q. Well, Mr. Gehrig, you had an opportunity to raise that through your counsel when this case was tried; isn't that correct?
A. We have tried.
Q. And this is not a new issue that's come up since the Court ruled in this matter, is it?
A. I don't care if it's a new issue or not. Until the day I die, I want to know what my rights are and I felt that I bought a piece of property, I paid for this property, we have improved this property, we have done things, and it was all done with the approval of the family, I mean of the plaintiff who is not even here. It was done with here approval and now we're being kicked in the face and saying that this was totally not done with anybody's approval and we're being cheated out of this property.
Q. Mr. Gehrig, is it your position that you're not going to do anything further until this or some other court orders or tells you to do it.
A. I would love to know what my rights are and what part of this thing is my property, and I'm not going to say I'm going to do it or I'm not going to do it. I want to know what really is my property and what's not my property, and what's been done over the last five or six years on this property and what things have been approved on this property that aren't mine anymore.
Q. Mr. Gehrig, isn't it a fact that last time you came to court, through your counsel, you asked for until June the 23rd to remove this stuff off this right-a-way?
A. Well, whatever the date was, June the 28th, 29th, whatever. I though it was the 28th.
At the close of the hearing the trial judge called a recess to allow the parties opportunity to resolve the matter cautioning them "if [they could not] resolve it satisfactorily, then the Court will have to resolve it." The matter apparently was not resolved that afternoon. The trial court issued an order on June 30, 1998 finding the Gehrigs' conduct was contemptuous and ordered them to serve thirty days in jail. He then suspended the thirty day jail sentence ordering the Gehrigs to "comply with the terms of the judgment and remove any and all obstructions and items of any kind which have been placed, planted, or erected by [them] on the servitude ... [by] July 30, 1998" or suffer revocation of the suspension and imposition of the thirty day jail sentence. The Gehrigs also were ordered to pay $3,000.00 in damages and all costs of the proceeding.
The Woodwards' attorney wrote to Milo on July 7, 1998 stating, after conferring with his clients, they had "no objection to leaving the wooden fence along the North boundary in place, notwithstanding the terms of the judgment, provided that:
1. The first fifteen (15) feet of the fence are removed in order to allow vehicles entering Lock Lane a better view of the road and of any traffic approaching from the North. At present, the fence prevents any view of oncoming traffic and thus constitutes a hazard; and
2. Plaintiff can request the removal of the entire fence, in accordance with the terms of the judgment, upon fifteen (15) written notice. In that event the Gehrigs, in turn, would have fifteen (15) days, after receipt of the written notice, to comply with the judgment and to finish removing the fence in its entirety along Lots 1, 2, and 3; and
3. Defendants do not request a new trial or file a motion for appeal. In the event a new trial is requested or an appeal is filed, this forbearance is null and void and plaintiff shall have the right to pursue her remedies pursuant to the judgments entered by Judge Painter, the Third Circuit, and Judge Babineaux; and

4. Defendants comply, in all other respects, with the letter and intent of said judgments; and

*933 5. Defendants signify their agreement by signing and returning a copy of this facsimile.
We gather from the correspondence between the lawyers, that Milo did not immediately respond to the offer to settle; instead, he contacted Judge Babineaux and requested a hearing ostensibly to "clarify" the judgment which his clients were directed to comply with by July 30, 1998. Milo then telephoned the Woodwards' attorney to advise that a telephone conference with the Judge was scheduled for 4:00 p.m. on July 29, 1998. The news that Milo had contacted the Judge ex parte surprised the Woodwards' attorney who then addressed a letter to Judge Babineaux expressing:
I understand that defendants desire yet another extension in which to comply with the plain terms of Judge Painter's and your judgments. Please be advised that we are opposed to any more extensions for the reason that, originally, Judge Painter granted defendants' 30-day extension and that you, in turn, generously granted a 30-day extension after a lengthy delay dedicated to the suspensive appeal and the Supreme Court writ application.
In addition, in response to a request from defendants' counsel, we offered to permit the retention of the boundary fence on the terms contained in our letter dated July 7, 1998, a copy of which is attached. We have not been contacted regarding the enclosed letter and have had no further communications from defendants' counsel other than his earlier request for yet another conference with you. Moreover, we have no assurance that defendants will not file yet another appeal and thus delay their compliance with the judgments for yet another year or so. Defendants have had more than sufficient time to remove the items placed by them on the servitude and have yet to remove the concrete foundation, the fence and some shrubbery....
The conference between the lawyers and the Judge was rescheduled to occur at 9:00 a.m. on July 30, 1998. The Woodwards' attorney relates:
Judge Babineaux was absolutely unwilling to grant any extension, to conduct another hearing for `clarification,' or to reconsider his judgment in any other manner. He stated that he had bent over backwards to get the parties to come to some agreement and that he would enforce the contempt portion of the judgment. I stated that we were in the process of verifying compliance and would be willing to extend the deadline to Sunday at 5 p.m. Milo then request that the deadline be extended to Monday and I agreed. For that reason, Judge Babineaux scheduled a hearing for 2:30 p.m. on Monday, August 3 and stated that, if the defendants had not cleared the servitude, the sheriff would do his duty and they would be incarcerated....
Milo and the Woodwards' attorney communicated several times by letter and telephone on that day and the next. Both genuinely believed the matter had been resolved. But their attempt to amicably resolved the dispute between the feuding neighbors was destined to unravel.
The lawyers corresponded in writing on July 30 and July 31, 1998, with each respectively expressing his understanding of the agreement between the parties regarding the fence. We note the gates were not mentioned. At 8:30 am. on the following Monday morning, Judge Babineaux called the Woodwards' attorney who advised him that the Gehrigs "had cleared the servitude but for the fence along the northern boundary" and his clients had agreed to accept "Milo's request that the fence be allowed to remain (but for a section obstructing the view and egress on Lock Lane)." Satisfied the parties had reached accord, Judge Babineaux canceled the hearing scheduled to commence that day. On the same day, Milo wrote another letter to the Woodwards' attorney stating:

*934 This letter shall confirm our discussions and what I believe to be our agreement.
Enclosed you will find a Satisfaction of Judgment which I hope meets with your approval. This simply confirms that we have fully complied with all terms of the Judgment, less and except those portions in which we have specific agreements otherwise. The only portion of the Judgment which I believe we have compromised is that portion which may apply to the northern fence. I understand our agreement is that in exchange for allowing the fences to remain, you retain the right to request its removal with thirty (30) days written notice to us of your request that we do so....
The Satisfaction of Judgment forwarded to the Woodwards' attorney for signature, though it purported to be "in full and complete settlement and satisfaction of the Judgment rendered ... on the 30th day of June, 1998 ..." made no mention of any exceptions or the particular agreement regarding the fence. Apparently the Woodwards were not aware the Gehrigs intended to use as leverage their complaint with the D.A.'s office to force return and replacement of the gate within the servitude boundary.
But the threat of incarceration, which once loomed large over the Gehrigs' heads, ceased by Monday when the Woodwards' attorney in good faith advised the Judge the parties had reached accord. Nonetheless, the Gehrigs' attorney filed a writ with this Court which he claims was submitted only "as precautionary measure." On August 4, 1998, we denied the Gehrigs' application with the following instructions:
"... the trial court [is ordered] to conduct an evidentiary hearing to determine whether the defendants have complied with the trial court's July 9, 1998 order. If the trial court finds the defendants have not complied with its order, the trial court shall give the defendants two days to remove any remaining obstructions on the servitude.
The Gehrigs then filed a writ application with the Louisiana Supreme Court. When the Woodwards attorney received notice of this filing, he sent a letter to Hunter Lundy, recently retained as co-counsel to represent the Gehrigs. Believing that Hunter was not "conversant with all the nuances in the case," the Woodwards' attorney attempted to provide him with a history of the events which transpired between the attorneys and the parties following rendition of Judge Babineaux's contempt order. Regarding the Satisfaction of Judgment, the Woodwards' attorney highlights the following passage found in it:
The only portion of the Judgment which I believe we have compromised is that portion which may apply to the northern fence. I understand our agreement is that in exchange for allowing the fence to remain, you retain the right to request its removal with thirty (30) days written notice to us of your request that we do so.
The attorney then relates:
I later received a call from Jim Williams, I believe, asking me about signing the `Satisfaction of Judgment' and I told him that the `satisfaction' refers only to the payment of $3,000 in damages "which amount is received ... in full and complete satisfaction of the Judgment entered in the above entitled cause on the 30th day of June, 1998 ..." Since I did not like the somewhat confused language of the judgment, I told Jim that it should be typed a "partial" satisfaction, acknowledging the receipt of the money. Besides, the proposed document also refers to the payment of court costs, and I have no idea whether defendants have paid all costs without a certification to that effect from the clerk of court.
* * *
At any rate, Jim gave me the impression that he would consider my comment and I believe he was going to revise it *935 and send me a new form to sign. To date, I have not received one.
At the same time, I have not led anyone to believe that we would request another hearing on the contempt issue. To the contrary, I informed both Judge Babineaux and Milo that my client was satisfied that the defendants had finally done what Jude Painter's Judgment ordered them to do. Moreover, if Milo or anyone wants written confirmation of that or wants a written agreement, on that, I, sure as hell, am not one to draft it for the defendants' approval. If they wish such a document, it seems to me they ought to let me know and prepare a draft for us to consider, approve, and sign.
I have no intention of spending any more time on this case, it is over, as far as I am concerned.
Please recall the writ application as quickly as possible. If this case is kept alive because of the application and we are forced to devote additional time and expense to this matter, we, too, will have to keep our options open ...
The writ application was not recalled but the Supreme Court denied it on August 11, 1998. Woodward v. Gehrig, 98-2149 (La.8/11/98); 717 So.2d 1127. On the same date Hunter wrote the Woodwards' attorney stating:
I have read your letter to Judge Babineaux and Milo Nickel's letter to you and have now had the Supreme Court's response to the writ read to me over the telephone. It appears to me that a simple satisfaction of judgment could end all of this turmoil-one that does not leave anything open for any interpretation. If you are satisfied that everything has been removed from the servitude and everyone is in compliance, please fax us a letter that states that you will sign a satisfaction of judgment and we will prepare one and send it to you....
Again, the letter did not mention the gates nor give the slightest hint that the Woodwards' "[satisfaction] that everything [had] been removed from the servitude" would turn to exasperation when they discovered the Gehrigs intended to maintain the criminal charges filed against Mr. Woodward. That day soon came. The Woodwards' attorney wrote to Judge Babineaux on August 24, 1998:
We had already advised both the court, the defendants, and their counsel that the gate was not wide enough to permit the passage of larger vehicles, such as fire trucks, emergency vehicles, or the dump trucks needed to carry broken concrete to the shoreline behind the Woodward residence. I understand both defendants were present when the gate was removed and we have, on several occasions, indicated that the gate would be turned over to the defendants and could be used by them for any purpose or replacement at its original site upon the expiration of the servitude. It appears, however, that defendants have filed criminal charges of theft (and unauthorized use of a movable) against the contractor who removed the gate and against plaintiff's husband, William D. Woodward, prior to the hearings conducted before you. Since then, it was our belief that the matter was finally concluded and I expressed that belief both to you and to Mr. Nickel, the counsel for the defendants on Monday, August 3, 1998. As a matter of fact, he confirmed that we had agreed that the servitude was finally cleared and that the North fence could remain on the conditions we had stipulated. I had also indicated to both you and Mr. Nickel that the Monday hearing you had scheduled to incarcerate the defendants for contempt of court was necessary and, at your request, I so informed your Lake Charles staff.
A few days after my telephone conversations with you and Mr. Nickel I learned of the engagement of Mr. Hunter Lundy, as co-counsel, and the filing of an emergency writ application to the Louisiana Supreme Court which was *936 mistakenly intended to stave off the perceived incarceration. As soon as I found this out, I told Mr. Lundy that we had no intention of seeking the defendants' incarceration and that I believed we finally had compliance and an agreement everyone could live with. I did send you a letter on August 10, 1998 to the effect that, since the Third Circuit had mandated yet another hearing, based on defendants' writ application, it might be a good idea for you to call such a hearing, if only to be sure there would be no loose ends. In view of the events which have occurred since said date, I only reiterate that a hearing would be appropriate, if only to make the agreement or understanding of the parties a matter of record.
I should reiterate, however, what I believe to have stated previously: My client has informed me that the servitude has been cleared in compliance with the judgment, but, for the fence remaining along the North boundary. As to said fence, my client has acceded to defendants' request that said fence be permitted to remain, while defendants have acceded to my client's stipulation or condition that they will voluntarily remove it on thirty days notice.
I regret to inform you that defendants now wish to pursue the criminal charges of theft or unauthorized use of the gate. Apparently, our impression that the matter had finally been put to rest was mistaken, if not naive. Unless these charges are quashed, nol prossed, or withdrawn, it is quite possible that an innocent contractor and Mr. Woodward and/or his spouse will be arrested and tried. I talked to Mr. Ronald Rossitto, the first assistant district attorney for Calcasieu Parish, this morning to confirm the facts I am presenting to you. He indicated that he has no choice but to proceed with the arrest and prosecution since he feels the gate was defendants' property. Such a declaration is rather astounding for the reason that the core controversy is civil in nature and any infringement could easily have been brought up on that context. It is also ominous in the sense that Mr. Rossitto informed me that the civil suit record had been reviewed by Mr. Wayne Frey, who is the chief of the felony section.
In view of these developments, we have no alternative but to ask that you follow up on the mandate from the Third Circuit and call a hearing at your earliest convenience....
In response the Gehrigs' attorney wrote a letter to the Judge the same day which stated in relevant part:
To the extent that Mr. Boellert is seeking some sort of hearing on the validity of the criminal charges, I do not believe that such a hearing is appropriate in this Court.
We of course, remain ready, willing and able to discuss these matters at any time as you have so instructed in the past. I have never had any conversations with Mr. Boellert about his gate, although I do understand the matter was raised once in a settlement conference with Mr. Ieyoub. Apparently when the plaintiffs sought dismissal of the criminal charges as a condition of settlement, Mr. Ieyoub believed that he was ethically precluded from entering into such a discussion. Mr. Ieyoub therefore can attest that this was not an attempt to blind side the plaintiffs. As I stated, we remain ready, willing and able to discuss these matters with our opposing counsel or with the Court at any time. Rest assured my clients are not unsympathetic to the threat of incarceration which Mr. Woodward faces. They would like nothing more than a resolution of this dispute as well....
The Court scheduled a hearing to commence on September 9, 1998. After much bantering between the parties regarding what they actually agreed upon, the Court called a recess commenting:

*937 "All right, Gentlemen, frankly I thought certainly that this matter should have been settled, and I didn't believe that I would have to come here today or at a later date. But before we reach the point of no return with this case here, at this time I'd like to take a little break and have a pretrial or a midtrial or a last pretrial with the attorneys and see if we can uncork this thing finally, and if not then, of course we'll come back and do what we feel that we should do. But I think that I owe it to the parties involved to try one more time to see if we can dispose of this thing finally. I don't believe that this is a case that people should be in jail for on either side, but as I say, if this thing follows its course, no telling what can happen here, and I think it's my duty to see that this matter here is ended today. So, we're going to try one more time and I would like, again, I have nothing but respect for the attorneys involved here. They're very creative and it's been a pleasure to work with them. I know its been difficult with the parties involved here, especially when things get sometimes out of hand, and once you get started, of course, you've got to keep going. So at this point we're going to take a break and I'd like to eyeball the attorneys one more time and see if we can get this thing finalized ..."
But finality was not too come. Though the Court found an "agreement" was reached between the parties sufficient to satisfy the Gehrigs' obligation to comply with the contempt judgment, he did not find the agreement totally resolved all the issues. In fact, he specifically commented: "The Court, of course, understands the issues of this case and, of course, was hoping that a total agreement could have been reached by the parties. Apparently it is not possible."
The Woodwards notified the Gehrigs on November 25, 1998, in addition to resurfacing the roadway, they intended to remove the gate and all trees, brushes and shrubs which allegedly was obstructing the road's use by trucks or other heavy vehicles. The Gehrigs responded by filing a petition seeking declaratory relief and an injunction prohibiting the Woodwards from removing the gate, resurfacing the road, and removing trees within the thirty foot right of way. Their petition alleged: (1) the intended use of the roadway articulated by the Woodwards greatly exceeds the scope and extent of the servitude; (2) the taking of the trees will cause irreparable harm to the Gehrigs; (3) the removal of the trees and paving is not necessary to further the purpose articulated by the Woodwards; and (4) the paving of the roadway and removal of trees "is a retaliatory gesture by [the Woodwards] .... intended only to intimidate them into submission and to force them to drop all demand that their gate be replaced." The Woodwards filed "Exception, Answer, and Reconventional Demand." First, they objected to the Gehrigs' petition "on the grounds of vagueness, prematurity, want of amicable demand, improper cumulation of actions, and improper joinder of parties." They also asserted res judicata, no right and no cause of action as peremptory exceptions to it. In reconvention, they sought a preliminary injunction restraining the Gehrigs from: (1) preventing the removal of the gate to the entrance of the servitude, (2) interfering in any manner with the removal of all obstacles or impediments to the construction or establishment of a straight roadway, twenty feet in width; including the removal of any vegetation, trees, bushes, or shrubbery, and (3) interfering with the improvement of the twenty-foot passage as an all-weather road. They asked for "all costs ..., attorney fees, and [reasonable] damages ..." Specifically, the Woodwards alleged the current dirt road's narrow width, numerous turns and twists, softness and slopes impedes convenient use and renders it unsafe to "negotiate" during inclement weather. They further complain the entrance gate is not sufficiently wide; and the "continual closing of the gate by the [Gehrigs] ... forces all *938 visitors and users of the passage to leave their vehicles, partly on the public road, in order to open the gate, before continuing on to [their] home." The Gehrigs' action in closing the gate, the Woodwards alleged, was done solely to impede their peaceful use of the servitude. The Woodwards also filed a separate pleading in the former proceeding entitled Woodward v. Gehrig, bearing docket number 96-3698 alleging "notwithstanding the terms of the consensual or voluntary servitude, the judgment rendered herein, the finding of contempt, the punishment imposed, and [their] repeated efforts to bring this matter to a conclusion, the [Gehrigs] continue to violate both the term as and intent or spirit of their agreement, the final judgment, and the post-judgment rulings of this Court in the following, nonexclusive particulars:
a. They filed charges with the District Attorney, accusing Mover's husband, William D. Woodward, of theft of their property, i.e. of the gate at the entrance to the servitude.
b. They interfered with the return and placement of the gate, ordering the contractor to install same at a location other than its original location, without first communicating with Mover, her husband, or her counsel.
c. They interfered with Mover's efforts to determine whether it would be possible for emergency equipment, trucks, or heavy vehicles to reach Mover or her home without straightening and improving the present dirt path.
d. They interfered with the efforts of Mover's surveyor to plot the boundaries of the servitude and the location of trees, bushes, and shrubs thereon by removing all markers.
e. They refused to accede to Mover's reasonable request to straighten and improve the current dirt path by filing another, separate lawsuit, entitled "Gehrig v. Woodward," and bearing No. 98-6412 on the docket of this Court, and obtaining a temporary restraining order, without notice, preventing Mover from improving the roadway.
f. They continue to close the gate at the entrance to the servitude, thus discouraging or preventing the proper use of the servitude and unreasonably forcing Mover, her guests, visitors, and others to leave their vehicles and open the gate."[2]
Though the stipulation does not appear in the record, the Woodwards assert they waived their "requests for revocation of the suspension of the prison sentence, damages and attorney fees, reserving only [the] request for such orders from the trial court as were appropriate, under the circumstances, to establish [their] right to use and maintain the servitude without further let or hindrance from [the Gehrigs]." After hearing on the Woodwards' Rule, Judge Babineaux issued an order on February 2, 1999 directing "that Plaintiff be permitted to remove trees and other obstructions from the pathway of the servitude for the purpose of improving the road and making its use more convenient" at their expense and further enjoining the Gehrigs "from closing the gate at the east end of the servitude at any time and that said gate is to remain open at all times so as to render use of the servitude more convenient." The Gehrigs filed a writ application with this court which we denied on March 12, 1999 stating: "Relator has an adequate remedy by appeal."
On March 3, 1996 Judge Carter, assigned to hear the Gehrigs' petition, issued written reasons denying their request for injunctive relief and dissolved "all prior temporary restraining orders issued in [the] matter ..." The Gehrigs filed an emergency writ application with this Court attacking Judge Carter's ruling. We granted a stay ordering: "All proceedings, including but not limited to the paving of *939 any roadway or removal of trees on the subject property involved in the instant litigation is hereby stayed pending further action by this court." We also granted writs in the matter and assigned it for oral argument. On April 28, 1999, the Louisiana Supreme Court issued an order in response to our denial of the Gehrigs' writ application attacking Judge Babineaux' ruling. The Court remanded that case to us for review and consolidation with the pending writ application addressing Judge Carter's ruling. Woodward v. Gehrig, 99-1020 (La.4/28/99); 741 So.2d 1.

ASSIGNMENTS OF ERROR
The Gehrigs assert Judge Babineaux erred:
1. In holding a hearing on [the Woodwards] rule to show cause to have the suspension of the contempt revoked when all delays for appealing the Court's ruling had expired.
2. In ruling that the [Woodwards] be permitted to remove trees and other "obstructions" from the servitude.
3. In enjoining the [Gehrigs] from closing the gate at the east end of the servitude and mandating that said gate remain open at all times.
They also complain that Judge Carter erred in denying their petition for preliminary writ of injunction.
The Woodwards have asked this Court to strike certain portions of the Gehrigs' applications and to sanction them for filing pleadings "based on half-truths and outright prevarication." They also complain that the Gehrigs filed a writ application with this Court in response to Judge Carter's ruling to avoid compliance with La. Code Civ.P. art. 3612 which required them to appeal his denial of the preliminary injunction and post a bond within 15 days. Further, they contend the Gehrigs' writ application to the Supreme Court attacking Judge Babineaux's ruling arrived too late. The record indicates the application was denied by this Court on March 12, 1999 and received by the Supreme Court on April 14, 1999.

ANALYSIS
Courts of appeal may exercise supervisory jurisdiction if an error by the trial court may cause the applicant irreparable injury or if an appeal will not afford an adequate remedy. Jones v. MFA Mut. Ins. Co., 398 So.2d 10 (La.App. 3 Cir.), writ denied, 399 So.2d 586 (La.1981). The Louisiana Supreme Court has ordered us to invoke our supervisory jurisdiction and consider the consolidated cases. As directed, we turn now to address the parties contentions.

JUDGE BABINEAUX'S RULINGS

A. Hearing on Revocation of Suspension Request.
The Gehrigs complain Judge Babineaux erred in conducting a hearing on the Woodwards' Rule to Show cause on January 14, 1999. The Rule, they assert, sought "to have the suspension of the contempt judgment revoked and to have an order issued requiring [them] to serve a term of (30) days in the Parish Jail." The Gehrigs also note, after a hearing on September 9, 1998, Judge Babineaux ruled they had complied with the July 9, 1998 contempt order by removing all obstructions placed by them on the servitude; and, he accordingly, "purged" their contempt citation. The original judgment and order, thus, they contend were final long before the Woodwards filed the present rule on December 3, 1998. As such, they maintain the Woodwards "were clearly seeking, by rule to show cause, substantive modification of a judgment which was final by virtue of the exhaustion of all appellate relief;" and "the trial court's subsequent modification of the judgment to allow the removal of trees and to force [them] to leave the gate open at all times ... were improper ... [and] is an absolute nullity." The Gehrigs' circuitous reasoning is not only confusing; it is patent nonsense.
*940 The original judgment rendered by Judge Painter "enjoined [the Gehrigs] from interfering in any manner with the servitude, including, but not limited to, plaintiffs right of passage thereon" and further they were "ordered to remove any and all obstructions, erected or placed by them on the servitude ... and immediately remove the lock from the gate at the east end of the above servitude."[3] The later contempt order issued by Judge Babineaux provided "in the event [the Gehrigs] have not fully and completely complied with the Judgment entered on May 28, 1997 ... and have not removed any and all obstructions and items of any kind' placed, planted, or erected by [them] on the servitude, by July 30, 1998, the aforementioned suspension is revoked and [they] shall serve the full term of the thirty-day sentence...."
It is true, the instant Rule moved that the Gehrigs show cause "why [the] court should not (1) revoke the suspension and order [them] to serve a term of thirty days in the parish jail." But it also prayed for attorney's fees, costs, damages, other punishment or sanction for the Gehrigs' continued wilful disobedience of the dignity and order of the court and the Woodwards' rights. Although the actual stipulation is not reflected in the record, as mentioned the Woodwards admit in brief they waived all demands, except "reserving only [the] request for such orders from the trial court as were appropriate, under the circumstances, to establish [their] right to use and maintain the servitude without further let or hindrance from [the Gehrigs]." Even if the Woodwards improperly included a request in the Rule for revocation of the suspension, as alleged by the Gehrigs, this error did not require dismissal of the entire Rule or that the trial judge refrain from hearing it. The Rule was clearly premised on alleged repeated acts of defiance and interferences by the Gehrigs which the Woodwards complain have not ceased since the first contempt hearing.
We also find without merit the Gehrigs' contention that the judgment rendered on the Rule was an absolute nullity because it constituted a modification or amendment of Judges Painter's judgment. While Judge Painter's judgment specifically directed them to unlock the gate at the east end, it also ordered the Gehrigs not to interfere in "any manner" with the servitude, including the Woodwards right of passage thereon. The Woodwards alleged the Gehrigs have "continue[d] to close the gate at the entrance to the servitude, thus discouraging or preventing the proper use of the servitude and unreasonably forcing Mover, her guests, visitors, and others to leave their vehicles and open the gate." Further, they alleged the Gehrigs have continually frustrated their effort to maintain the passageway and make it safe for use by emergency and other heavy vehicles.
The February 2, 1999 judgment merely addressed the Gehrigs continued disobedience. It did not alter, amend, or modify the original judgment. A court possesses all the power necessary to enforce its lawful orders even though not granted expressly by law. La.Code Civ.P. art. 191; de Nunez v. Bartels, 97-1384 (La.App. 1 Cir. 9/9/98); 727 So.2d 463. The finality of a judgment does not divest the court of authority to enforce it.

B. Removal of Trees and Keeping the Gate Open
Again, the Gehrigs complain that requiring them to leave the gates open as opposed to merely keeping them unlocked constitutes an illegal modification of the prior judgment which is final. For reasons already expressed, we find this argument without merit. Its is nothing more *941 than an obvious attempt to disobey Judge Painter's judgment.[4]
Next the Gehrigs contend that requiring them to leave the gate open and ordering them to permit the Woodwards to remove trees and other obstructions from the roadway constitutes an impermissible expansion of the servitude in violation of La.Civ.Code art. 730. This provision merely states that "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."
Most of the complaints the Gehrigs raise attacking the existence and extent of the servitude were voiced or they had opportunity to do so when the matter was tried. Judge Painter's judgment is final and we will not disturb it by revisiting issues already heard and adjudicated. Neither are we moved to reverse Judge Babineaux's order directing them to keep the gates open and permit removal of trees or other obstruction within the pathway. La.Civ. Code art. 748 provides "[t]he owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude." Even the Gehrigs' attorney suggested in a letter dated May 4, 1998 "by way of compromise that the gates [would] remain unlocked and open and the roadway unobstructed." They only requested that the Woodwards "leave whatever structures or trees [were] currently in the servitude but not on the roadway, in place." The servitude area extends thirty feet wide. The Woodwards propose to straighten and resurface only twenty feet of it for safe use as a roadway. The Gehrigs did not provide the trial court with any alternative plan which might have accommodated their interest in preserving the trees within the twenty feet area. The Woodwards offered them opportunity as well to meet and discuss a plan to improve the roadway. Instead, they opted to engage in acts intended merely to frustrate the Woodwards' use of the servitude and to litigate by regurgitating issues previously adjudicated. Judge Babineaux did not err in refusing to entertain them further.

JUDGE CARTER'S RULINGS

A. Denial of Preliminary Injunction
The Gehrigs contend Judge Carter also erred when he denied their request for preliminary injunction seeking to prevent the Woodwards from removing trees and paving the roadway within the servitude area. Judge Carter agreed with Judge Babineaux's ruling. Citing Louisiana Civil Code article 748, he noted:
In interpreting this article, the Third Circuit Court of Appeal has held that the owner of a dominant estate is entitled to free and unencumbered use of his servitude of passage across the servient estate, and that the installation and locking of a gate across the servitude constitutes an inconvenience and restriction on the servitude, which is precisely what LSA-C.C. Art. 748 prohibits. Hudson v. McAvoy, 380 So.2d 1248 (La.App. 3 Cir.1980). In the instant case, this Court concludes that if the Woodwards are enjoined from requiring that the gates at the entrance to the pathway remain open and if they are enjoined form paving and removing trees from the pathway, this would render use of the servitude more inconvenient in violation of Article 748.
Judge Carter's reasoning is sound and we join him in agreeing with Judge Babineaux's ruling. Further, we deem this filing nothing more than a collateral attack. A collateral attack is "defined as an attempt to impeach the decree in a proceeding not instituted for the express purpose of annulling it." Nethken v. Nethken, 307 So.2d 563, 565 (La.1975). The Louisiana Supreme Court has said: "No principle of law has received greater and *942 more frequent sanction, or is more deeply imbedded in our jurisprudence, than that which forbids a collateral attack on a judgment or order of a competent tribunal, not void on its face ab initio." Id. at 565. Issuance of a preliminary injunction in the proceeding pending before Judge Carter would directly impede enforcement of the orders in the original proceeding. The Gehrigs have not filed an action to annul the judgments in that proceeding; and, they are barred from attacking them collaterally.

THE WOODWARDS' MOTIONS

A. Motion to Dismiss
Our ruling renders moot the Woodwards' motion seeking dismissal of the writ applications for alleged procedural violations.

B. Motion to Strike and Sanction
The Woodwards have motioned this Court to sanction the Gehrigs for filing pleadings that allegedly contain "misrepresentations, falsification, or exaggeration" of the facts and references to matters not in evidence. We have reviewed the record evidence in entirety and agree the Gehrigs' counsels have included facts in the briefs that are superfluous to the legitimate issues assertable before this Court and they have come dangerously close to misrepresenting the evidence actually introduced. But we forego imposing sanctions in this case; the assertions though overzealous and inaccurate were not entirely frivolous.

DECREE
For the foregoing reasons, we affirm the trial courts' judgments and rescind our order staying the proceedings. All costs of this appeal are assessed against Melvin and Natalie Gehrig.
AFFIRMED.
NOTES
[1] Regarding the lock, the trial court's judgment ordered the Gehrigs "immediately remove the lock from the gate at the east end of the ... servitude."
[2] In response, the Gehrigs' filed a MOTION FOR STAY AND/OR DISMISS AND OPPOSITION TO RULE TO SHOW CAUSE which was denied by the trial judge.
[3] As noted earlier, the judgment was affirmed in all respect by this Court on appeal, except for that portion granting the Gehrigs' the option to provide "another equally adequate and conventional location for access to Lots 4 and 5 of Cyprien Estates."
[4] Whatever comments Judge Brunson made in chambers to the contrary were not reduced to judgment or filed in the record.